UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

LOCAL UNION NO. 97, INTERNATIONAL
BROTHERHOOD OF ELECTRICAL
WORKERS,
                         Plaintiffs,

v.                                     5:05-CV-1192
                                     (GTS/GHL)
NRG ENERGY, INC.,
                         Defendants.
_____

APPEARANCES:                           OF COUNSEL:

BLITMAN & KING LLP               DONALD D. OLIVER, ESQ.
  Counsel for Plaintiff               DANIEL R. BRICE, ESQ.
Franklin Center                   DANIEL E. KORNFELD, ESQ.
443 North Franklin Street, Suite 300
Syracuse, NY 13204-1415

PEPPER HAMILTON LLP           BARAK A. BASSMAN, ESQ.
  Counsel for Defendant           SUSAN K. HOFFMAN, ESQ.
3000 Two Logan Square
18th and Arch Streets
Philadelphia, PA 19103-2799

GILBERTI STINZIANO HEINTZ & SMITH    TIMOTHY J. LAMBRECHT, ESQ.
  Counsel for Defendant
555 East Genesee Street
Syracuse, NY 13202-2159

HON. GLENN T. SUDDABY, United States District Judge

## DECISION and ORDER

On September 20, 2005, Plaintiff filed this labor action, pursuant to Section 301 of the

Labor-Management Relations Act ("LMRA"), 29 U.S.C. § 185, alleging that Defendant failed to

comply with the terms of an arbitration ruling in Plaintiff's favor.  More specifically, Plaintiff's

1

Complaint asserts that, pursuant to an arbitration award, Defendant must recalculate pension benefits for all bargaining unit employees who retired between June 1, 2001, and September 30, 2003, using "Covered Earnings" at $16,500.00 and paying all affected retirees the difference between the recalculated pension benefits and the retirement benefits actually paid to them. (Dkt. No. 1.)  In its request for relief, Plaintiff has also asked for its reasonable attorneys' fees and costs incurred in this action.  (Dkt. No. 1.)

On August 21, 2006, Defendant filed a motion for summary judgment seeking dismissal of the action in its entirety.  (Dkt. No. 21.)  On October 2, 2006, Plaintiff filed a cross-motion for summary judgment.  (Dkt. No. 27.)  After carefully considering the parties' motion papers, and for the reasons that follow, Defendant's motion is denied and Plaintiff's cross-motion is granted.

## I.        RELEVANT LEGAL STANDARD

For the sake of brevity, the Court will not repeat the well-known legal standard governing motions for summary judgment pursuant to Fed. R. Civ. P. 56.  Rather, the Court will refer the parties to its decision in *Proctor v. Kelly*, 05-CV-0692, 2008 WL 5243925, at *3-4 (N.D.N.Y. Dec. 16, 2008) (Suddaby, J.).

## II.       UNDISPUTED MATERIAL FACTS

NRG Energy ("NRG" or "Defendant") owns and operates a variety of energy-related operations worldwide, including electric power generating facilities in Dunkirk, Tonawanda, and Oswego, New York.  Local Union No. 97 of the International Brotherhood of Electrical Workers (the "Union" or "Plaintiff"), represents bargaining unit employees at these three facilities.  On May 5, 1999, Niagara Mohawk Power Corporation ("Niagara Mohawk"), NRG, and the Union entered into a tripartite Memorandum of Agreement ("tripartite agreement") concerning the

2

transfer of collective bargaining unit employees to NRG.  The tripartite agreement stated that NRG agreed to assume the terms and conditions of the 1996-2001 Niagara Mohawk/Union collective bargaining agreement, and extend the expiration date of the assumed agreement through September 30, 2003.  In accordance with the 1996-2001 Niagara Mohawk/Union collective bargaining agreement, NRG calculated retiree pensions using a $16,500 cap on "Covered Earnings" from June 1999 through May 31, 2001.

On June 1, 2001, NRG unilaterally stopped using the $16,500 cap on "Covered Earnings" and began using an amount based on yearly United States Social Security Administration published average earnings data.  The Union claimed that NRG's benefit calculation methodology violated the then-effective Collective Bargaining Agreement ("CBA") between NRG and the Union, and the Union filed a contract grievance on January 16, 2002.  NRG denied the grievance on January 27, 2002.  After unsuccessful settlement negotiations, on June 28, 2002, the parties submitted their grievance to arbitration, as mandated by the CBA, to settle the dispute.  The Grievance Arbitration Hearing was scheduled to be heard before Arbitrator Robert Herzog on July 23 and 24, 2003.  The arbitration hearing was delayed several times.

In the interim, on May 14, 2003, approximately sixteen (16) months after the Union filed its contract grievance, NRG filed a voluntary petition for reorganization under Chapter 11 of the United States Bankruptcy Code, in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").  On this same day, NRG sent a letter to each of its employees, as well as the Union, which stated that NRG's bankruptcy filing "should have little, if any, affect on employees."  The letter also stated, "We expect employee wages and salaries to continue to be paid in the normal course and employee benefits to continue uninterrupted,

3

subject to the terms of the plan and policy."  Finally, the letter stated that the bankruptcy filing "has no impact upon NRG's current qualified defined contribution 401(k) and qualified pension plans.  Under federal law, your pension benefits and 401(k) are not subject to claims by NRG's creditors."[1]

The Bankruptcy Court set July 14, 2003, as the bar date ("deadline") for filing proofs of claim against NRG's bankruptcy estate.  The Union admits that it had actual knowledge of both the bankruptcy case and the proof of claim deadline before July 14, 2003.  The Union also admits that it received a proof of claim form prior to the July 14, 2003, proof of claim deadline. However, NRG admits that it did not directly inform all NRG employees who retired during the period June 1, 2001, through September 30, 2003, of the proof of claim deadline.

In July 2003, NRG and the Union agreed to cancel the hearings scheduled for July 24 and 25, 2003, in order to attempt to settle the dispute informally.  The agreement to cancel the hearings was confirmed by letter sent by NRG's attorney Robert L. Hobbins on July 22, 2003. In the letter, Mr. Hobbins stated that it was "the Company's commitment to bargain in a good faith attempt to reach a mutually acceptable resolution as part of a comprehensive settlement for a new collective bargaining agreement."  Despite the fact that the Union had a pending arbitration action against NRG, the Union never filed a proof of claim.

On August 20, 2003, NRG and the Union met in Syracuse, New York, and exchanged contract proposals for a new collective bargaining agreement.  One of the Union's bargaining proposals was to return "Covered Earnings" to $16,500 and recalculate all pension benefits for

---

[1]       Article 11.1 of the NRG Affiliates Pension Plan, entitled "NRG Affiliates Pension Plan for Dunkirk, Huntley and Oswego Employees, effective June 11, 1999" (hereinafter "the NRG Pension Plan"), provides that NRG Affiliates Pension Plan assets are held in trust for the benefit of NRG Pension Plan participants and their beneficiaries.

4

the June 1, 2001, through September 30, 2003, term of the agreement, and maintain the $16,500

level for the term of any new collective bargaining agreement.  As a result of the negotiations,

the parties agreed on the "Covered Earnings" level for employees retiring after September 30,

2003.   However, the parties were unable to settle the dispute that was then pending in arbitration

regarding the Covered Earnings level for employees retiring on or before September 30, 2003.

On November 24, 2003, the Bankruptcy Court entered the Confirmation Order

confirming the Chapter 11 Plan.  In December 2003, NRG and Xcel Energy, Inc. ("Xcel")

entered into an "Employees Matter Agreement" pursuant to which NRG agreed to

> indemnify and hold Xcel . . . harmless from any liability or expense
> resulting from any claim of any nature that relate to, arise out of, or
> result from . . . any acts or omissions or alleged acts or omissions by or
> on behalf of NRG or any NRG Subsidiary as participating employers
> under the Pension Plan . . . and any acts or omissions or alleged acts or
> omissions by or on behalf of NRG or any NRG Subsidiary under or
> with respect to any plan sponsored or maintained by NRG or NRG
> Subsidiary that was merged into the Pension Plan . . . .

After several delays, on February 17, 2005, Arbitrator Herzog began conducting hearings

on the "Covered Earnings" dispute regarding employees retiring on or before September 30,

2003.  Both the Union and NRG were represented by counsel at the hearings.  During the

hearings, the Union and NRG stipulated to submission of the following issue to Arbitrator

Herzog for final and binding decision:

> Whether the Company violated the collective bargaining agreement by
> using an amount other than $16,500 for the 'Covered Earnings' portion
> of the benefit formula in calculating the pension benefit of the grievant
> and other eligible bargaining unit members who retired between June
> 1, 2001 and September 30, 2003?

In addition, during the hearings, NRG's attorney, Mr. Hobbins, stated to the Arbitrator

that Xcel was not a necessary party to the arbitration.  NRG also introduced the NRG Pension

5

Plan into evidence during the hearings as the operative pension plan document for determination of the "Covered Earnings" dispute.  NRG never mentioned or claimed, either before or during the arbitration, that the Chapter 11 reorganization had discharged the claims addressed in the arbitration.  NRG also did not raise the Chapter 11 reorganization as a defense during the arbitration.

In its post-hearing brief, NRG stated that the NRG Pension Plan "provided that all Plan assets would be held in a trust fund to be used for 'the payment of benefits to such persons as are entitled thereto in accordance with the Plan.'" The brief also stated in footnote 7 that "it is from this trust fund that all NRG pension benefits are payable."

On June 25, 2005, the Arbitrator ruled in the Union's favor.  Nonetheless, NRG has declined to pay additional pension benefits to the affected retirees based on the arbitrator's award.  On August 26, 2005, NRG sent a letter to Xcel, which requested that Xcel "recalculate pension benefits for the affected retirees as set forth in the [Arbitration] Award and make the supplemental pension payments . . . for Local 97 participants in the Xcel Pension Plan who terminated from June 1, 2001 to September 30, 2003 . . . ."  In response, on September 15, 2005, Xcel sent a letter to NRG, which stated that

> "NRG, through its acts or omissions, violated the terms of the CBA
> with IBEW Local 97 by not establishing its pension plan to include the
> proper date on which the $16,500 covered earnings cap would expire.
> The Arbitrator's Award against NRG holding that NRG violated the
> CBA is not binding on Xcel Energy nor the Plan of which the NRG
> Plan is now a part.  Under the Employee Matters Agreement, NRG is
> responsible for all liability arising out of its acts or omissions with
> respect to its plans merged into the Plan, and while a participating
> employer under the Plan."

On September 30, 2005, NRG sent a letter to Niagara Mohawk, which requested that it "indemnify NRG if [NRG] is ordered by the court either to provide the additional benefits

directly to plan participants or to fund such additional benefits through additional contributions . . . ."  On October 11, 2005, Niagara Mohawk sent a reply letter, informing NRG that its request was "unfounded, inappropriate, and untimely."  On October 20, 2005, NRG requested a Private Letter Ruling from the Internal Revenue Service ("IRS") regarding the legality of amending NRG's current pension plan to pay the benefits ordered by the arbitrator that were payable under the Xcel Plan.  The request for a ruling is currently pending before the IRS.

## III.   ANALYSIS

### A.   Impact of the Bankruptcy Order on the Instant Action

On June 25, 2005, Arbitrator Robert Herzog ruled in the Union's favor regarding whether NRG violated the CBA.  Specifically, Arbitrator Herzog made the following three findings:

> (1) NRG "violated the CBA by using an amount other than $16,500 for the 'covered earnings' portion of the benefit formula in calculating the pension benefit of the grievant and other eligible bargaining unit members who retired between June 1, 2001 and September 30, 2003; (2) in calculating retirement benefits, 'Covered Earnings' shall mean 'Earnings set at $16,500 until September 30, 2003; [and] (3) [NRG] shall recalculate the pensions granted bargaining unit employees who retired between June 1, 2001 and September 30, 2003,  applying 'Covered Earnings' as [defined, and NRG] shall have the difference between [the recalculation amount and] the retirement benefits actually paid to said retirees remitted to said retirees. . . ."

Defendant advances three arguments that it believes justifies its failure to comply with Arbitrator Herzog's ruling.  First, Defendant argues that the Chapter 11 reorganization plan that was confirmed in an Order by the Bankruptcy Court precludes the Union's claim.  This is because, according to Defendant, the Bankruptcy Court had jurisdiction over the Union's NRG Pension Plan claim, and the Union failed to join in the bankruptcy proceedings.  Second, Defendant argues that it has not waived its right to rely on the Chapter 11 Plan and Confirmation Order despite the fact that it failed to assert its argument that the Union's claim is precluded by

the Bankruptcy Court Order at any time leading up to or throughout the arbitration proceedings. Third, Defendant argues that, because the NRG Pension Plan is no longer sponsored by NRG, the Union's claims properly lie only against the Xcel Plan.

In response, Plaintiff argues that the pension monies at issue in the "Covered Earnings" dispute were not part of the bankruptcy estate, and therefore, were not subject to discharge in the Chapter 11 proceeding.  In addition, Plaintiff argues that the "Covered Earnings" dispute was a subject of the 2003 negotiations between Plaintiff and Defendant, and the agreement to have Arbitrator Herzog decide the dispute was part of the 2003-2007 labor contract.  Plaintiff also argues that Defendant waived any alleged bankruptcy defense by proceeding with the arbitration and never raising bankruptcy as an issue in the hearings before Arbitrator Herzog.  Finally, Plaintiff argues that Defendant's post-arbitration conduct, whereby Defendant sought to have the arbitration award paid by other parties, is evidence that Defendant's bankruptcy defense is without merit.

As an initial matter, the Court notes that "[t]he polic[y] of section 301 [of the Labor-Management Relations Act] . . . recognize[s] the importance of arbitration and provide[s] for limited judicial review of arbitral decisions."  *Skyview Owners Corp. v. Serv. Employees Int'l Union, Local 32BJ, AFL-CIO*, 04-CV-4642, 2004 WL 2244223, at *3 (S.D.N.Y. Oct. 5, 2004); *see also Livadas v. Bradshaw*, 512 U.S. 107, 121 (1995).  Therefore, "when a court is called upon to review the validity of an award which is the result of a consensual arbitration, its review is limited primarily to whether the underlying dispute is one which the parties agreed to arbitrate, with any doubts being resolved in favor or arbitrability."  *Stone & Webster Eng'g Corp. v. Local Union No. 38 of Oswego, New York and Vicinity*, 461 F. Supp. 882, 891 (N.D.N.Y. 1978) (Munson, J.) [citations omitted].

Here, Plaintiff and Defendant consented to arbitration.  In addition, Defendant does not challenge Arbitrator Herzog's ruling.  As a result, this Court will enforce Arbitrator Herzog's decision provided that it concludes that it has jurisdiction over the action.

Whether the Court has jurisdiction over the action depends on whether the funds at issue are part of the bankruptcy estate.  *Cf. In re Hopkins*, 346 B.R. 294, 303 (Bankr. E.D.N.Y. 2006) (noting that property of the bankruptcy estate falls under the exclusive jurisdiction of the bankruptcy court), *with Bennett v. Mfrs. & Traders Trust Co*., 99-CV-0827, 2000 WL 1611065, at *2 (N.D.N.Y. Oct. 18, 2000) (Munson, J.) (noting that when a debtor files a bankruptcy petition, certain funds that are not part of the bankruptcy estate are "subject to civil suits"). "[F]unds deposited by a debtor to a trust account pursuant to the guidelines of a pension plan are exempt from property of the debtor's bankruptcy estate, in New York, if the plan is qualified under section 401 of the Internal Revenue Code of 1986, as amended."  *In re Feldman*, 171 B.R. 731, 735 (Bankr. E.D.N.Y. 1994) [citations omitted].  In addition, "estate creditors [may be precluded] from reaching certain trust funds, including qualified pension trust funds, [under] . . . Bankruptcy Code section 541(c)(2)."  *In re Feldman*, 171 B.R. 731, 735 n.2 (Bankr. E.D.N.Y. 1994) (citing 11 U.S.C. § 541(c)(2) [1994]).  "Under section 541(c)(2), the bankruptcy estate will not include the debtor's interest in property in a trust if there is an enforceable non-bankruptcy law restriction upon the debtor's right to alienate such interest."  *In re Feldman*, 171 B.R. at 735 n.2 [citation omitted].[2]

This is because, "[u]nder section 541 of the Bankruptcy Code, [only] a debtor's legal and equitable interests in property, 'as of the commencement of the case,' constitute 'property of the

---

[2]     "Trusts that have such restriction include state-law defined 'spendthrift' trusts, and trusts retaining pension funds contributed pursuant to plans covered by the Employee Retirement Income Security Act of 1974 ("ERISA").  *In re Feldman*, 171 B.R. at 735 n.2.

estate.'" *In re Howard's Appliance Corp.*, 874 F.2d 88, 93 (2d Cir. 1989) (citing 11 U.S.C. §

541(a)[1].).  Conversely, "[p]roperty in which the debtor holds only legal title and not an

equitable interest, . . . [is] property of the estate 'only to the extent of a debtor's legal title to such

property, but not to the extent of any equitable interest in such property that the debtor does not

hold.'"  *In re Howard's Appliance Corp.*, 874 F.2d at 93 (citing 11 U.S.C. § 541[d]).  In other

words, "the bankruptcy estate does not include property of others in which the debtor has some

minor interest such as a lien or bare legal title." *Id.* [citations and internal quotations omitted].

In sum, "while the outer boundaries of the bankruptcy estate may be uncertain, 'Congress plainly

excluded property of others held by the debtor in trust at the time of the [debtor's] filing of the

[bankruptcy] petition.'"  *Id.* [citations omitted].  Therefore, when a debtor files a bankruptcy

petition, funds that are held by the debtor "in ERISA-qualified plans . . . [are] excluded [from the

bankruptcy estate] and subject to civil suits to redeem unpaid benefits due." *Bennett*, 2000 WL

1611065, at *2.

   "According to the plain terms of the statute, ERISA 'shall apply to any employee benefit

plan if it is established or maintained–(1) by any employer engaged in commerce or in any

industry or activity affecting commerce; or (2) by any employee organization or organizations

representing employees engaged in commerce or in any industry or activity affecting commerce;

or (3) by both.'"  *Arnold v. Lucks*, 392 F.3d 512, 518 (2d Cir. 2004) (citing 29 U.S.C. § 1003[a]).

"[I]f a benefits plan is an ERISA-qualified employee benefits plan in some circumstances, then it

is an ERISA-qualified employee benefits plan in all circumstances." *Lucks*, 392 F.3d at 519.

"This approach not only avoids the anomaly that the same plan will be controlled by discrete

regimes, but furthers ERISA's goal, which, as the Supreme Court has emphasized, is uniform

national treatment of pension benefits." *Id.* [citations and internal quotations omitted].

Here, the NRG Pension Plan is clearly an ERISA-qualified plan.  First, the NRG Pension Plan is an employee benefits plan that was established or maintained by NRG, an employer in commerce.  Second, the Preamble to the NRG Pension Plan states that "[t]he Plan is intended to meet the requirements of sections 401(a) and 501(a) of the Internal Revenue Code of 1986, as amended, and the Employee Retirement Income Security Act of 1974, as amended."

Because the NRG Pension Plan is ERISA-qualified, the Court finds that the assets held in the Trust Fund under the NRG Pension Plan were not part of the bankruptcy estate.  As a result, the Court finds that the Trust Fund assets, which includes all the assets in dispute that Arbitrator Herzog issued a ruling on, were not subject to the bankruptcy proceedings and the Bankruptcy Court's Order.  Therefore, the fact that Plaintiff failed to file a proof of claim with the Bankruptcy Court is of no legal significance.  Moreover, the Court notes that, had Plaintiff filed a proof of claim against Defendant, they may have been deemed to have "consent[ed] to the jurisdiction of th[e] [bankruptcy] court with respect to their claims against the debtor."  *In re J.T. Moran Financial Corp.*, 118 B.R. 233, 235 (Bankr. S.D.N.Y. 1990) [citations omitted].  This is because "[t]he filing of a proof of claim against a debtor is part of the process of allowance and disallowance of claims which is integral to the restructuring of debtor-creditor relations."  *In re J.T. Moran Financial Corp.*, 118 B.R. at 235 [citation omitted].

Based on the above findings, the Court concludes that it has jurisdiction over the instant action, and accordingly, the Court will enforce Arbitrator Herzog's decision in its entirety.  In addition, because the Court finds that the NRG Pension Plan is not a part of the bankruptcy estate, the Court need not address the issue of waiver, and therefore declines to do so.

### B.       Pre-Judgment Interest

Plaintiff argues that it is entitled to prejudgment interest from the date of the arbitration award.  Defendant did not address this argument in its response.

"The decision whether to grant prejudgment interest in arbitration confirmations is left to the discretion of the district court."  *Serv. Employees Int'l Union, Local 32BJ, AFL-CIO v. Stone Park Assocs., LLC and A.M. Prop. Holding Corp*., 326 F. Supp.2d 550, 555 (S.D.N.Y. 2004) [citation omitted].  "[I]n the context of arbitration award confirmations . . . there is "a presumption in favor of prejudgment interest."  *Serv. Employees Int'l Union*, 326 F. Supp.2d at 555 (citing *Waterside Ocean Navigation Co. v. Int'l Navigation Ltd*., 737 F.2d 150, 154 [2d Cir. 1984]).  "Following this rationale, district courts within the Second Circuit have exercised their discretion to award prejudgment interest when confirming arbitration awards under collective bargaining agreements pursuant to § 301 of the LMRA, when the CBAs indicated that an arbitration award was "final and binding."  *Id*. [citations omitted].

"Determining the rate of interest to be applied is also within the discretion of the district court."  *Id*. [citations omitted].  "Because the LMRA is silent with respect to a prejudgment interest rate, the 'common practice' among courts within the Second Circuit is to grant interest at a rate of 9%, the rate of prejudgment interest under New York State law, N.Y. C.P.L.R. §§ 5001-5004."  *Id*. [citations omitted].

The CBA states that "it is understood that the arbitration decision shall be final and binding upon both parties."  The CBA further states that "monetary benefits accruing to employees as a result of the settlement of a grievance shall be payable during the period in which the grievance is processed up to a maximum time period of . . . eighteen (18) months for any

12

grievance settled in or by arbitration, and such time periods shall be effective as of the date of occurrence as shown on such grievance that was presented to the Company in writing." Finally, the CBA states that expenses associated with any arbitration proceeding "shall be borne equally by the two parties."

Because the CBA states that an arbitration award is "final and binding," an award of prejudgment interest is warranted. However, because Defendant had eighteen (18) months to satisfy the arbitration award, running from the date of the award, the Court finds that awarding pre-judgment interest during the eighteen (18) months following the arbitration award would not be proper. As a result, the Court concludes that pre-judgment interest should be awarded in the amount of nine percent (9%) starting from the date of December 20, 2006.

### C.     Attorney's Fees

Plaintiff claims that it is entitled to recover attorney's fees in this action. Defendant has not addressed this request in its papers.

"Ordinarily, attorney's fees cannot be recovered in a federal action in the absence of statutory authority, and neither Section 301 of the LMRA nor the FAA provide for attorney's fees in actions to confirm an arbitration award." *New York City Dist. Council of Carpenters Pension Fund, et al. v. Eastern Millenium Constr., Inc*., 03-CV-5122, 2003 WL 22773355, at *2 (S.D.N.Y. Nov. 21, 2003) (citing *Int'l Chem. Workers Union Local No. 227 v. BASF Wyandotte Corp*., 774 F.2d 43, 47 [2d Cir.1985].). "However, because a court may, in the exercise of its inherent equitable powers, award attorney's fees when opposing counsel acts in bad faith, attorney's fees and costs may be proper when a party opposing confirmation of [an] arbitration award 'refuses to abide by an arbitrator's decision without justification.'" *Eastern Millenium Constr., Inc*., 2003 WL 22773355, at *2 [citation omitted].

At this point, the Court will reserve judgment on the issue of attorney's fees because further briefing on the matter is necessary for this Court to determine whether or not Defendant's failure to abide by Arbitrator Herzog's decision was justified.  The Court requests that each party submit a letter brief on the issue of attorney's fees within the next thirty (30) days.

**ACCORDINGLY**, it is

**ORDERED** that Defendant's motion for summary judgment is (Dkt. No. 21) is **<u>DENIED</u>**; and it is further

**ORDERED** that Plaintiff's cross-motion to for summary judgment (Dkt. No. 27) is **<u>GRANTED</u>**; and it is further

**ORDERED** that Defendant NRG comply with the arbitration award dated June 25, 2005 of Arbitrator Robert Herzog by recalculating pension benefits for all bargaining unit employees who retired between June 1, 2001 and September 30, 2003 utilizing Covered Earnings at $16,500.00 and paying all affected retirees the difference between the recalculated pension benefits and the retirement benefits actually paid to said retirees; and it is further

**ORDERED** that Defendant pay Plaintiff prejudgment interest in the amount of nine percent (9%) per year running from December 20, 2006, until the date on which Defendant satisfies its obligation to Plaintiff pursuant to the Arbitration Award; and it is further

**ORDERED** that, within **<u>THIRTY (30) DAYS</u>** of the date of this Decision and Order, both parties shall submit, for the review of this Court, a letter brief on the issue of attorney's fees; and it is further

**ORDERED** that the Clerk of the Court is directed to enter judgment and close this case.


Dated: May 08, 2009
      Syracuse, New York


Hon. Glenn T. Suddaby
U.S. District Judge